**BETHLEHEM MINES CORPORATION**

v.

**UNITED MINE WORKERS OF
AMERICA et al., Appellants.**

**No. 72–1767.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 21, 1973.

Decided March 20, 1974.

Donald B. Heard, Kathleen A. Merry, Reed Smith Shaw & McClay, Pittsburgh, Pa., for appellees; Daniel C. Mills, Bethlehem, Pa., of counsel.

Joseph A. Yablonski, Washington, D. C., Lloyd F. Engle, Jr., Melvin P. Stein, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for appellants; Eugene A. Creany, Engelhart, Creany, Engelhart & Leahey, Ebensburg, Pa., of counsel.

Before FORMAN, ALDISERT and GARTH, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

Bethlehem Mines Corporation (Bethlehem), a corporation of West Virginia, filed a complaint against United Mine Workers of America (UMWA), W. A. Boyle, President; United Mine Workers of America, District No. 2 (District No. 2), Owen F. Slagle, President; United Mine Workers of America, Local Union No. 1368 (Local 1368),[1] William A. Risbon, President; Frank Claypool, Vice President, George W. Commons, Recording Secretary, Charles D. Neff, Committeeman, in the United States District Court for the Western District of Pennsylvania seeking a declaratory judgment and an injunction under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. and the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 141 et seq.[2] Bethlehem alleged that it was in an industry affecting commerce as defined in the Labor-Management Relations Act, that through its Cambria Division in Cambria County, Pennsylvania, it mined and processed coal for its parent, Bethlehem Steel Corporation; that an actual controversy of a justiciable nature existed between the parties at Mine 33, one of six comprising the Cambria Division of Bethlehem; that the UMWA, District No. 2[3] and Local 1368 are unincorporated labor organizations and through their officers and agents represent 450 employees of Bethlehem within the Western District of Pennsylvania for the purposes of collective bargaining and have entered into a labor agreement covering wages, hours of work, and other conditions of employment; that the most recent agreement is the National Bituminous Coal Wage Agreement of November 12, 1971, expiring November 12, 1974 (the 1971 Agreement). The litigation chiefly revolves around Article XVII thereof, a compulsory grievance and arbitration provision.[4]

1. UMWA, District No. 2 and Local 1368 are collectively referred to as appellants at times hereinafter.

2. On their motion, the District Court dismissed the action as to the defendants W. A. Boyle, Owen F. Slagle, William A. Risbon, Frank Claypool, George W. Commons and Charles D. Neff, because it had no jurisdiction over individual members of a labor organization under § 301 of the Labor-Management Relations Act.

3. District No. 2 is in the nature of an administrative organization.

4. Article XVII of 1971 Agreement reads:
"Article XVII—SETTLEMENT OF DISPUTES
"*Section (a)* Mine Committee
"A committee of three employees shall be elected at each mine by the employees at such mine. Each member of the mine committee shall be an employee of the mine at which he is a committee member, and shall be eligible to serve as a committee member only so long as he continues to be an employee of said mine. The duties of the mine committee shall be confined to the adjustment of disputes arising out of this agreement that the mine management and the employee or employees have failed to adjust. The mine committee shall have no other authority or exercise any other control, nor in any way interfere with the operation of the mine; for violation of this section any and all members of the committee may be removed from the committee. (1941)
"*Section (b)* Grievance Procedure
"Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences

Bethlehem's complaint further alleged that a preliminary injunction was issued by the District Court, which compelled Bethlehem and the UMWA parties to abide by the provisions of Article XVII for the settlement of all disputes at Mine 33; that on March 21, 1972 a further illegal work stoppage occurred over a job bid and assignment involving John Rafacz, an employee-member of Local 1368; that following a hearing in the said District Court for a citation of contempt, the difference was submitted to Bethlehem under Article XVII of the collective bargaining Agreement; that on April 4, 1972 Owen F. Slagle, President, District No. 2, wrote Larry Bellotti, Superintendent of Bethlehem's Cambria Division, as follows:

"On March 23, 1972 John Rafacz, employee at Mine 33, filed a grievance with your company and failed to resolve said grievance. The grievance was properly processed by Local Union 1368, United Mine Workers of America under the terms of the National Bituminous Coal Wage Agreement of 1971. The grievance was heard in Third Step on March 28, 1972, and no agreement was reached.

"Therefore, I notify you that I must insist that this grievance be processed with immediate dispatch provided for in Article XVII of said agreement. To this end, I am demanding that your company now agree to the orderly process of this grievance as provided in Article XVII, Article I, and Article XIV (sic), Section B of the wage agreement.

"Therefore, with the fervent hope that you will comply with my request, I am setting April 10, 1972 at 10:00 a. m. at the Candlelight Motel, Ebensburg, Pennsylvania to which place and time we shall be present with necessary Union staff and our witnesses to present our case as provided for in the wage agreement as required to above. Please confirm.

"Sincerely yours,
"/s/ Owen F. Slagle
"Owen F. Slagle, District
President, United Mine
Workers of America"

Bethlehem further alleged that on the same day Mr. Slagle telephoned Mr. Bellotti that Maurice Shadden should be present at the Fourth Step meeting and thereafter act as Umpire in the Fifth Step in accordance with the custom and practice followed by the UMWA and Bethlehem under the terms of the 1968 National Agreement, as amended, between District No. 2 and the Central Pennsylvania Coal Producers Association (CPCPA), of which Bethlehem insisted that it was never a member of CPCPA nor a signatory to the agreement, and that, in any event, the agreement was duly terminated prior to its expiration date in 1968 by the CPCPA.

---

arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time. (The parties will not be represented by legal counsel at any of the steps below.):

&ast; &ast; &ast; &ast; &ast;

"(5) Should the Board fail to agree the matter shall, . . . be referred to an umpire who shall expeditiously and without delay decide said case. The decision of the umpire shall be final. . . .

" * * * The decision shall be binding on both parties and shall not be subject to reopening except by mutual agreement.

"*Section (c)* Joint Committee on Arbitration Procedure

"A committee of equal representation from the Employers and the Union will be appointed immediately after the execution of this agreement to study the feasibility of a permanent or chief umpire and/or a panel of umpires to arbitrate disputes which may arise under the terms of the agreement.

"The committee will examine methods of selection, tenure, compensation and related matters and will complete its report and recommendations no later than April 1, 1972."

Bethlehem alleged that Mr. Bellotti replied to Mr. Slagle on April 5, 1972 as follows:

"Dear Mr. Slagle:

"This will acknowledge your letter of April 4, 1972, and confirm our subsequent telephone conversation that afternoon.

"We are, of course, anxious to proceed with the Joint Board meeting in the Rafacz grievance, pursuant to provisions of Article XVII (b)(4) of the National Bituminous Coal Wage Agreement of 1971. As you know, the Third Step was completed on March 28, 1972, and the procedure requires that the Joint Board meet on or before April 7, 1972; however, under the circumstances, we are agreeable to the extension of time to April 10, 1972, which you have requested, but without establishing a precedent for such extentions [sic], because it is essential in such matters that they be handled expeditiously in accordance with the specific terms of the National Agreement.

"You indicate that you intend to present the evidence all over again. As you know, the record is already complete and closed, all evidence having been taken at the Third Step. I see no need to rehash it again, however, if you have further evidence, or if there is some new evidence, we certainly agree that it should be heard, and we propose that Step Three be reconvened for this purpose. In this regard, the Fourth Step should be limited to consideration of the evidence already in the record. It is the very essence of the grievance machinery, as it has been substantially amended in the 1971 agreement, that grievance matters be handled expeditiously and within specific time limits, and in this regard, the repetition of evidence at the Fourth Step can only slow down the procedure.

"With respect to your insistence on having an umpire present on April 10, 1972, we respectfully suggest that no useful purpose would be served by his presence, and conversely, his presence at the Joint Board meeting would usurp the function of the Joint Board. An umpire is not required unless the Joint Board disagrees, at which time, an umpire should be selected and the matter should be referred to him within the required 10 days, which is consistent with the terms of the grievance procedure as set forth in Article XVII (Section b).

"To reiterate, we shall be pleased to attend the Joint Board meeting on April 10, 1972 as you have requested, but without prejudice or precedent concerning the delayed scheduling, at which time the evidence already presented should be refused by the Joint Board but without further evidence being presented at that Step.

"I suggest that you call me at your earliest convenience if you disagree, in order that we may further discuss this matter.

"Very truly yours,
"/s/ L. F. Bellotti
"L. F. Bellotti
"Division Superintendent"

Bethlehem also alleged that nothing in Article XVII of the Agreement provides for the presence of an umpire at the Fourth Step [5] nor does it provide for the continuance of a permanent umpire under the expired agreement; that under the terms of the current collective bargaining agreement Article XVII provides for "a committee to select a permanent or chief umpire and/or a panel of umpires," but that although a committee representing the Bituminous Coal Operators Association (BCOA) and the UMWA has met twice, no agreement has been reached concerning such selection.

Bethlehem further alleged upon information and belief that in the event it

5. See note 4.

continues to refuse to permit the presence of Mr. Shadden at the Fourth Step and/or to select him as the umpire under the Fifth Step, the UMWA and Local 1368 and their members will engage in an illegal work stoppage, to its irreparable harm.

The complaint prayed for the entry of a declaratory judgment which shall determine among other things "whether plaintiff is legally obligated under Article XVII of the 1971 Agreement, . . . to accept the services of Maurice Shadden as Umpire on a permanent basis, or otherwise; . . . ."

The complaint also prayed

"That a temporary restraining order be issued forthwith, and that after hearing, a preliminary injunction be issued, to be made permanent on final hearing, enjoining defendants, their officers, representatives, and members, and all persons acting in concert with them or in their behalf from:

\* \* \* \* \* \*

"engaging in a strike or work stoppage at plaintiff's Mine No. 33 and/or its adjacent Preparation Plant in Cambria County, Pennsylvania, to enforce their demand that Arbitrator Shadden be appointed as the Umpire."

The complaint further requested that steps Four and Five of the grievance procedure be suspended without prejudice to either party pending determination of the issues raised above and that if representatives of the UMWA and Bethlehem were unable to mutually agree upon an umpire to hear the Rafacz grievance at the Fifth Step, arbitrators from the Federal Mediation and Conciliation Service should be requested.

The answer of UMWA, District No. 2 and Local 1368 admitted some of the allegations of the complaint, denied others, and was grounded on the defense that the District Court was without jurisdiction in the case on account of lack of service. It also relied on the defense that the "National labor policy and law developed thereunder required arbitration of issues in the manner in which they were agreed to be arbitrated and further required that procedural arbitration disputes be decided by arbitration and not by resort to the courts."

The case came to a hearing before the District Court without a jury. Testimony was taken and briefs were submitted. After consideration thereof, the District Court filed "Findings and opinion" in which, among other things, it held that a justiciable issue exists between Bethlehem and UMWA, District No. 2 and Local 1368 and that a declaratory judgment was necessary to settle the legal obligations of the parties and to permit them to abide by the order of the District Court issued December 15, 1972 concerning the grievance of John Rafacz, and that failure to resolve the difference could result in a work stoppage to the irreparable damage of Bethlehem.

The Court further found that Bethlehem and the union parties were obligated to settle disputes subject to the procedure set forth in Article XVII of the National Agreement of 1971,[6] Step 5 of which called for final arbitration by an umpire selected by mutual agreement of the parties; that Bethlehem is not obligated under Article XVII of the Agreement of 1971 to accept the services of Mr. Shadden as a *permanent* umpire in the grievance of John Rafacz; that the umpire shall be a person selected by mutual agreement of the parties, and in the event of their failure to do so, the District Court would designate the manner of selection of the umpire.

The UMWA, District No. 2 and Local 1368 were permanently enjoined by the District Court from engaging in a strike or work stoppage at Bethlehem's Mine 33 to enforce the demand that Mr. Shadden be appointed umpire. Subsequently, finding that the parties were unable to agree on the selection of an umpire, the

6. See note 4.

Court set forth the procedure to be followed in the selection of an arbitrator.[7] The UMWA, UMWA District No. 2 and Local 1368 thereupon took this timely appeal from the orders of the District Court.

I

The appellants reiterated their arguments here as they had submitted them to the District Court, maintaining that on June 19, 1941 the Central Pennsylvania Coal Producers' Association and many other producers' and operators' associations and operators had entered into a national agreement with the International UMWA, District No. 2 and eleven other UMWA districts, in which the associations recognized the UMWA as the exclusive bargaining agency representing their employees in Pennsylvania, Michigan, Ohio, Maryland, West Virginia, Virginia, Northern Tennessee and part of Kentucky. The agreement was known as the Appalachian Agreement. It contained, among others, a provision entitled "Settlement of Disputes," which set forth a system for the settlement of disputes by representative organs of the contracting parties. If the dispute failed of settlement by any of them, it was provided finally that

". . . the matter shall be referred to an umpire selected by said Board [two of whom shall be designated by the Mine Workers and two by the Operators]. Should the Board be unable to agree on the selection of an umpire, he shall be designated by the International President of the United Mine Workers of America and the President of the Operators' Association affected." [8]

Bethlehem was neither a member of or represented by the CPCPA nor was it otherwise a signatory to the Appalachian Agreement.

Another agreement was entered into on October 22, 1941 between CPCPA and the UMWA, District No. 2, in which the Appalachian Agreement was incorporated by reference. This agreement also provides in its Rule 16 Arbitration for a method of the settlement of differences by various organs of the parties up to a Fourth Step in which it is agreed that

". . . district conferences may establish an intermediate board consisting of two (2) commissioners, one representing the Operators and one representing the Mine Workers with such powers as said conferences may delegate.

"Should the fourth method fail, the matter shall be referred to a permanent Board of Arbitration, consisting of two Mine Workers or their representatives and two Operators or their representatives. They jointly failing to agree shall refer the matter to a permanent umpire to be selected jointly by the Operators and the United Mine Workers of America, District No. 2." [9]

7. The following guidelines were laid down in the Order of the District Court of July 17, 1972:

"1. The Federal Mediation and Conciliation Service will supply a list of three qualified arbitrators to this court, and send copies of that list to the counsel for the parties to this action in accordance with the terms of a letter of request from this Court attached to this Order.

"2. The Defendant shall first strike one name from that list, and advise Plaintiff of the name which has so been stricken.

"3. The Plaintiff shall then strike one name from the list, and report the name of the remaining arbitrator to Defendant and to this Court. The Court will notify the Federal Mediation and Conciliation Service of the selection of this arbitrator as Umpire and the parties shall subsequently proceed to complete the proceedings under Step 4 of the procedure as set forth in Article XVII—Settlement of Disputes, of the National Bituminous Coal Wage Agreement of 1971, and to submit the grievance of employee John Rafacz, a member of Local 1368, United Mine Workers of America, and District #2, United Mine Workers of America, to said Umpire in accordance with Step 5 of said Article." App. at 158.

8. Defendant's Exhibit A at 14.

9. Defendant's Exhibit A at 118.

Again there is no contention that CPCPA represented Bethlehem or that it was a signatory to this agreement.

In 1968 and 1971 Bituminous Coal Operators Association (BCOA) in which Bethlehem was a member, executed National and District contracts. Bethlehem was represented by BCOA.

Appellants buttressed their contention that the District Court erred in exonerating Bethlehem from the acceptance of Mr. Shadden as permanent umpire by citing Schlecht v. Hiatt [10] and Calhoun v. Bernard.[11] In *Schlecht* the court compelled a single small contractor to contribute to trust funds designated in a provision in a building trades agreement to which he was a signatory which specifically referred to the "Trust or Fund Agreement of each respective Union" to which the contractor was not a signatory. In *Calhoun*, the court directed a contractor to contribute to a pension fund created by a master agreement to which the contractor had formerly been a signatory and which was specifically referred to in a subsequent memorandum agreement between the contractor and the union. The *Schlecht* and *Calhoun* agreements were local, not related to any national agreements, and protective of a significant employee interest. They are not analogous to the situation in the instant case where the national agreement speaks in generalities of the district agreements and asserts its superiority in case of conflicts.

When examined in the light of the totality of circumstances prevailing in the case at bar, the foregoing references give no significant support to appellants' argument.

Next appellants assert that there had been permanent umpires since 1934 so that before and since the 1941 Agreement exclusively, permanent arbitrators decided not only the grievances arising from CPCPA organizations but also those arising from other operators in District No. 2; and that, in fact, Bethlehem itself had accepted Mr. Shadden without objection in a number of instances. Hence appellants argued that Bethlehem had bound itself to continue to accept Mr. Shadden as permanent umpire until the expiration of the 1971 Agreement, at which time only could it attempt to change the provision for a permanent umpire by an exercise of the collective bargaining process.

Appellants cited a number of cases to support their position that Bethlehem was bound by practice amounting to the "law of the shop," among them: United Steelworkers of America v. Warrior and Gulf Navigation Co.,[12] insofar as it holds generally that a collective bargaining agreement encompasses more than the writing signed by the parties; United Furniture Workers of America Local 395 v. Virco Manufacturing Corp.[13] holding that "in determining what the contract is, so as to properly interpret it, an arbitrator or court should properly consider not only the formal written agreement but the actual practices prevailing between the parties as well." American Machine & Foundry Company v. UAW, Local 116 [14] was named by ap-

---

10. 271 F.Supp. 644 (D.C.Or.1967), rev'd on other grounds, 400 F.2d 875 (9th Cir. 1968).

11. 333 F.2d 739 (9th Cir. 1964), aff'd on rehearing after remand, 359 F.2d 400 (9th Cir. 1966).

12. 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). One of the noted trilogy in which the Supreme Court took a broad view of the scope of the arbitrator's source of the law and held it was not to be confined to the express provisions of the contract but that the "industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agree-

ment although not expressed in it." 363 U. S. at 581, 582, 80 S.Ct. at 1352.

13. 257 F.Supp. 138 (E.D.Ark.1962). While permitting the inclusion of specific practice in the interpretation of a contract, the court specifically indicated that the employer by giving notice could alter current practice, thereby unilaterally changing the contract.

14. 256 F.Supp. 161, 163 (S.D.N.Y.1963), aff'd, 329 F.2d 147 (2d Cir. 1964). The latter opinion fails to disclose the specific "past practice of the parties." The court

pellants as demonstrating error on the part of the District Court in failing to apply the "law of the shop" to the conduct of Bethlehem in this case.

Appellants also claim support for their contentions in NLRB v. Local 825, Operating Engineers,[15] asserted by them to hold "that a written contract though signed by only one party is nevertheless binding if the second party accepts the contract and both parties rely on it."

The appellants also pointed to Torrington Company v. Metal Products Workers Union Local 1645 (*Torrington I*)[16] for a general proposition that the broad scope of matters encompassed in a collective bargaining agreement was recognized by the court, and Torrington Company v. Metal Products Workers Union Local 1645 (*Torrington II*)[17] as additional authority that a collective bargaining agreement can include terms not explicitly contained within it. But appellants ignore the majority opinion in *Torrington II* which twice states the general rule that a labor contract ordinarily recites affirmative agreements and not discontinued practices.

Appellants relied on Smith v. Pittsburgh Gage and Supply Co.,[18] Hamilton Foundry and Machine Co. v. International Molders and Foundry Workers,[19] and Philadelphia Marine Trade Association v. ILA[20] to support their position that Bethlehem's past acceptance of Mr. Shadden bound Bethlehem.

The foregoing cases submitted by the appellants have been reviewed and their salient features noted in the margin hereof. Contrary to appellants' contention, they simply do not support their position. All miss the target formed by the pattern of the case at bar. None relates to the course of conduct pursued by Bethlehem in this case insofar as it never became a signatory to any contract recognizing a permanent umpire. Indeed, *United Furniture Workers*[21] appears to support Bethlehem's position rather than that of the appellants, since Bethlehem did in fact give oral notice of its objection to Mr. Shadden as an arbitrator.

It is also significant that Article XVII of the 1971 Agreement provides therein for an umpire and not a *permanent* umpire.[22] The only mention of permanent umpire occurs in Article XVII where it looks to a committee of representatives "of the employees and union to study the feasibility of a permanent . . . umpire" and on ex-

upheld an arbitrator's decision to affirm the employer's right to require overtime work and to discipline individual employees for refusal to work overtime.

15. 315 F.2d 695, 699 (3d Cir. 1963), in which a Union held by the NLRB to have engaged in unlawful secondary activity, sought to evade responsibility for its acts on the ground that it failed to sign a contract notwithstanding its acceptance and action upon it in every way as if it had signed. This court upheld the finding of the Board that the absence of the signature of the Union did not excuse it from complying therewith. However, in the instant case Bethlehem was not a party to the District No. 2 agreement.

16. 347 F.2d 93 (2d Cir. 1965), cert. den., 382 U.S. 940, 86 S.Ct. 394, 15 L.Ed.2d 351 (1965). *Torrington I* does indeed contain dicta that "custom or common understanding" may have the effect of applying a collective bargaining agreement to a matter not specifically provided for within that agreement. The basic issue decided, however, was that the district court is required to consider disputed issues of fact before granting summary judgment in declaratory judgment actions on the arbitrability of grievances.

17. 362 F.2d 677 (2d Cir. 1966). *Torrington II* held that an arbitrator exceeded his authority by implying a past practice into a new agreement.

18. 464 F.2d 870 (3d Cir. 1972) in which the court dealt with the application of res adjudicata to a redrafted complaint.

19. 193 F.2d 209 (6th Cir. 1951) holding a contract enforceable where it expresses the mutual agreement of the parties but was unsigned by one of the parties.

20. 78 L.R.R.M. 2610 (Pa.C.P. of Phila.Cty. 1971) (oral opinion) in which the court held a contract existed, though unsigned, due to estoppel resulting from both parties' knowledge of a press release signifying that an agreement had been reached.

21. See note 13.

22. See note 4 (section (b) (5) ).

amination of "methods of selection, tenure, compensation and related matters . . . will complete its report and recommendations no later than April 1, 1972." [23] The rendition of the report has been deferred indefinitely.

Appellants claim that Bethlehem is bound to recognize Mr. Shadden as permanent umpire because provisions of preceding contracts relating to arbitration were incorporated by reference in the succession of contracts including the National Bituminous Coal Wage Agreements of 1968 and 1971 to which Bethlehem was a party.

The National Bituminous Coal Wage Agreement of 1968 in its opening paragraph states:

". . . This agreement (subject to the amendments, modifications and supplements hereinafter provided) carries forward and preserves the terms and conditions of the Appalachian Joint Wage Work Week Agreement, the National Bituminous Coal Wage Agreement (dated April 11, 1945) effective April 1, 1945, and all the various district agreements executed between the United Mine Workers of America and the various operators and coal associations (based upon the aforesaid basic agreements) as they existed on March 31, 1946, subject to the terms and conditions of this agreement and as amended, modified and supplemented by this agreement as herein set out." (Plaintiff's Exhibit 7 at 1.)

In the article therein entitled "Settlement of Local and District Disputes," the 1968 Agreement reads in pertinent part:

"5. Should the board fail to agree the matter shall, within twenty (20) days after decision by the board, be referred to an umpire to be mutually agreed upon by the operator or operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. . . ." (Plaintiff's Exhibit 7 at 10.)

On its face that agreement fails to mention a permanent Umpire.

The 1971 Agreement, currently operative, in its opening paragraph, specifies that it "carries forward and preserves the terms and conditions of all the various district agreements executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this agreement . . . ." (Plaintiff's Exhibit A attached to the Complaint at 1.)

Bethlehem concedes that if it were a member of CPCPA it would be bound by any agreement into which that organization entered on its behalf, but there is no evidence that Bethlehem has ever been a member of CPCPA. The incorporation by reference of one or more CPCPA contracts where there was mention of a permanent umpire [24] as well as the many agreements other than by District No. 2 presented a recital of documents too vague and uncertain to obligate Bethlehem to acceptance of Mr. Shadden as permanent arbitrator.

In any event for whatever effect it may be contended the contracts of the CPCPA with UMWA District No. 2 had on obligating Bethlehem to accept the services of Mr. Shadden as arbitrator or permanent umpire, it is clear that CPCPA gave timely written notice that it would no longer accept him before the close of the 1968 Agreement and prior

23. See note 4 (section (c)).

24. See e. g. agreement between CPCPA and the UMWA, District No. 2, of October 22, 1941, Rule 16, which provides:
"Should the fourth method fail, the matter shall be referred to a permanent Board of Arbitration, consisting of two Mine Workers or their representatives and two Operators or their representatives. They jointly failing to agree shall refer the matter to a permanent umpire to be selected jointly by the Operators and the United Mine Workers of America, District No. 2." Defendants' Exhibit A, p. 118.

to the execution of the 1971 Agreement.[25] Bethlehem, too, gave such notice, although it was not in writing but made orally. It would therefore appear, as the District Court ruled, since Bethlehem was not committed to any written contractual undertaking with District No. 2, Bethlehem was under no duty to formally notify in writing District No. 2 of its objection to Mr. Shadden as arbitrator, and that its verbal notification was adequate to terminate Bethlehem's recognition of Mr. Shadden. The reference by incorporation could not survive the expiration of any obligation contained in the CPCPA agreements.

■ The argument of appellants that Bethlehem was bound to accept Mr. Shadden regardless of any written contract obligation because Bethlehem was obligated to conform to the custom and practice in the industry carries no greater weight. Unquestionably Mr. Shadden had served as arbitrator in resolving differences under preceding contracts of UMWA District No. 2 and CPCPA. Bethlehem had itself, indeed, accepted him in several cases. In a matter preceding the dispute at the base of the instant case, prior to the execution of the 1971 contract, Bethlehem had already made known its objection to Mr. Shadden's services as arbitrator, and acceded to his acting only after its counsel agreed thereto as a compromise in that particular case.

The agreements in this case provided for arbitration of disputes and, prior to the 1971 Agreement, for the mutual choice of the parties through their respective designated organs of a permanent arbitrator or chairman of arbitrators. Bethlehem was never shown to have contracted for or agreed to the appointment of Mr. Shadden as permanent arbitrator and its acceptance of him as arbitrator in a few cases was not shown to be such a participation in a universal custom and practice of the industry as to bind it to the acceptance of Mr. Shadden as permanent umpire. In this connection the evidence was clear that District No. 2 was unique in encouraging the settlement of disputes by arbitration commissioners representing each party to the agreement, and if Mr. Shadden enjoyed a long and continuous tenure as umpire or arbitrator, it was as a result fortuitously of his selection case by case rather than by reason of his induction into a permanent office as such. Such interpretation is fortified by the 1971 contract, which went no further than to provide for a committee consisting of representatives of the parties to study the feasibility of the appointment of a permanent umpire. But in no way was Bethlehem burdened with the acceptance of Mr. Shadden as arbitrator against its choice. Appellants' theories that either contractual obligation or custom or practice committed Bethlehem to the acceptance of Mr. Shadden as arbitrator under its current agreement are not sustained, and the District Court did not err in so holding.

## II

Appellants assert that the District Court violated the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., and the mandate of the Supreme Court in Boys Markets, Inc. v. Retail Clerks Union Local 770,[26] by permanently enjoining the UMWA, District No. 2, and Local 1368 from engaging in a strike or work stoppage to enforce the demand that the permanent umpire should be utilized.

■■ At best the record discloses the prayer of the complaint in the District Court for an injunction. Ordinarily an issue not raised by the pleadings or otherwise in the District Court will not be heard on appeal absent exceptional circumstances. Kappel v. United States.[27] It is obviously important that only an oblique reference to this issue in

25. See note 4.

26. 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

27. 437 F.2d 1222, 1224 (3d Cir. 1971).

the parties here achieve a final determination of the issue as early as possible, since delay is susceptible of blocking the disposition of other disputes and grievances. A remand of the issue for amendments of pleadings and initial consideration by the District Court appears now to be wholly impracticable, considering the time which would elapse until a decision could be rendered. Since the question has been fully briefed by the parties, it is deemed that a present disposition here and now is consistent with the decision in Kappel v. United States, supra.

Recognizing that the Supreme Court in Boys Markets limited the scope of the Norris-LaGuardia Act and expanded the jurisdiction of the federal courts "in certain limited circumstances," appellants urged that Boys Markets was inapplicable to the instant case because of the absence of a "no strike obligation" in the 1971 contract and because none of the appellants had struck to force Bethlehem to submit the grievance to a permanent umpire. Appellants presented an analysis of a number of the previous agreements and called particular attention to the absence of an express no-strike clause in the 1971 Agreement. The appellants contended that if such an obligation is to be found in the contract, it must be implied from the presence of an arbitration provision and from Article XX, the integrity clause.[28]

Appellants relied heavily upon United Mine Workers of America v. NLRB,[29]

wherein the Court of Appeals for the District of Columbia Circuit analyzed the 1941 Appalachian Agreement and the Agreements of 1945, 1947 and 1952, and concluded that the 1952 Agreement was not to be read as imposing a no-strike obligation upon the union parties.

Appellants conceded that since United Mine Workers v. NLRB, supra, the integrity clause of the National Bituminous Coal Wage Agreement has been construed as constituting a no-strike obligation in Lewis v. Benedict Coal Corp.[30] and Mile Branch Coal Co. v. NLRB.[31] Appellants sought to distinguish those decisions from the present case and argued that they ignored the admonition that a contract must be "read as a whole." Appellants contended that United Mine Workers v. NLRB, supra, is the better reasoned decision and should be followed, arguing vigorously that otherwise the indispensable strike weapon of unions would be rendered powerless.

Appellants also stressed that Boys Markets affords no basis for avoiding the clear restrictions of the Norris-LaGuardia Act on the jurisdiction of the District Court in this case.

The position of the appellants that the District Court transgressed the Norris-LaGuardia Act and Boys Markets in issuing its injunction is untenable. Rather than the support appellants claimed Boys Markets supplied, that case appears to give firm foundation to the contentions of Bethlehem. It expressly

28. "Article XX—MAINTAIN INTEGRITY OF CONTRACT
"The United Mine Workers of America and the Employers agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' article of this agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts." Plain-

tiff's Exhibit A (attached to the complaint), at 54, 55.

29. 103 U.S.App.D.C. 207, 257 F.2d 211 (1958).

30. 259 F.2d 346 (6th Cir. 1958) which relied on United Construction Workers v. Haislip Baking Co., 223 F.2d 872 (4th Cir. 1955) and W. L. Mead, Inc. v. International Bhd. of Teamsters, D.C., 126 F.Supp. 466, aff'd, 230 F.2d 576 (1st Cir. 1956), and the dissenting opinion in United Mine Workers v. NLRB, 103 U.S.App.D.C. 207, 257 F.2d 211 (1958).

31. 109 U.S.App.D.C. 265, 286 F.2d 822 (1961), cert. denied, 365 U.S. 871, 81 S.Ct. 905, 5 L.Ed.2d 861 (1961).

overruled Sinclair v. Atkinson [32] in the opening paragraph of its opinion, declaring:

"In this case we re-examine the holding of Sinclair Refining Co. v. Atkinson, 370 U.S. 195, [82 S.Ct. 1328, 8 L.Ed.2d 440] (1962), that the anti-injunction provisions of the Norris-LaGuardia Act preclude a federal district court from enjoining a strike in breach of a no-strike obligation under a collective-bargaining agreement, even though that agreement contains provisions, enforceable under § 301(a) of the Labor Management Relations Act, 1947, for binding arbitration of the grievance dispute concerning which the strike was called. . . . Having concluded that *Sinclair* was erroneously decided and that subsequent events have undermined its continuing validity, we overrule that decision and reverse the judgment of the Court of Appeals." (Pages 237, 238, 90 S.Ct. page 1585 (footnotes omitted).)

The Court went on to say:

"From the time Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, [77 S.Ct. 912, 1 L.Ed.2d 972] (1957), was decided, we have frequently found it necessary to consider various substantive and procedural aspects of federal labor contract law and questions concerning its application in both state and federal courts. *Lincoln Mills* held generally that 'the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws,' 353 U.S. at 456, [77 S.Ct. at 918], and more specifically that a union can obtain specific performance of an employer's promise to arbitrate grievances. We rejected the contention that the anti-injunction proscriptions of the Norris-LaGuardia Act prohibited this type of relief, noting that a refusal to arbitrate was not 'part and parcel of the abuses against which the Act was aimed,' *id.*, at 458, [77 S.Ct. at 918], and that the Act itself manifests a policy determination that arbitration should be encouraged. See 29 U.S.C. § 108. Subsequently in the *Steelworkers Trilogy* [United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424] we emphasized the importance of arbitration as an instrument of federal policy for resolving disputes between labor and management and cautioned the lower courts against usurping the functions of the arbitrator. [Pages 242, 243, 90 S.Ct. page 1588 (footnotes omitted).]

\* \* \* \* \* \*

"As we have previously indicated, a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration. See Textile Workers Union v. Lincoln Mills, *supra*, 353 U.S. at 455, [77 S.Ct. at 917]. Any incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated. [Pages 247, 248, 290 S.Ct. page 1591, (footnote omitted).]

\* \* . \* \* \* \*

"Even if management is not encouraged by the unavailability of the injunction remedy to resist arbitration agreements, the fact remains that the effectiveness of such agreements would be greatly reduced if injunctive relief were withheld. Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures.

32. 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962).

This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate. [Page 249, 90 S.Ct. page 1591]

\* \* \* \* \* \*

"The *Sinclair* decision, however, seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices. Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking. On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration. We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case. [Pages 252, 253 [90 S.Ct. page 1593] (footnote omitted).]

\* \* \* \* \* \*

"The dissenting opinion in *Sinclair* suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief—principles that we now adopt:

" 'A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.' 370 U.S., at 228, [82 S.Ct., at 1346]. (Emphasis in original.)" (Page 254, 90 S. Ct. page 1594.)

Just as in *Boys Markets*, so, too, here ". . . there is no dispute that the grievance in question was subject to adjustment and arbitration under the collective-bargaining agreement and that the petitioner was ready to proceed with arbitration at the time an injunction against the strike was sought and obtained. The District Court also concluded that, by reason of respondent's violations of its no-strike obligation, petitioner 'has suffered irreparable injury and will continue to suffer irreparable injury.' " (Page 254, 90 S.Ct. page 1594.)

A review of the contracts in evidence in the case at bar can leave no doubt that the parties named therein inexorably followed a path for disposition of disputes and grievances leading to arbitration rather than by litigation in the courts. In the National Bituminous

Coal Wage Agreement of 1971, while there was no specific provision to refrain from strikes, the determination to arbitrate differences was clearly and distinctly defined in Article XVII.[33]

Indeed, the Court very recently in Gateway Coal Co. v. United Mine Workers of America, et al.,[34] took occasion to underscore its decision in *Boys Markets* in construing the National Bituminous Coal Wage Agreement of 1968, the predecessor of the 1971 Agreement, which governs the case at bar. The section of the 1968 Agreement entitled "Settlement of Local and District Disputes" differs only in small details from Article XVII of the 1971 Agreement.

*Gateway* involved a safety dispute which a majority of our court concluded should be treated *sui generis*. We held, among other things, that there was a public policy disfavoring compulsory arbitration of safety disputes and that absent an express provision of the collective bargaining agreement, the union had no contractual duty to submit the controversy to arbitration and hence there was no implied obligation not to strike.

The Supreme Court took a different view. It held that the arbitration provision in the 1968 Agreement "appears sufficiently broad to encompass the instant dispute" and that the presumption of arbitrability announced in United Steelworkers of America v. American Manufacturing Co.[35] and its associated cases applies to safety disputes and that the arbitration clause in the parties' collective bargaining agreement covered the dispute in the case before the Court.

Whether the District Court had authority to enjoin the work stoppage was considered in *Gateway* in the light of the holding in *Boys Markets*. In this regard the Court concluded that "Although the collective bargaining agreement in *Boys Markets* contained an express no-strike clause, (footnote omitted) injunctive relief also may be granted on the basis of an implied undertaking not to strike." [36] Absent an explicit expression of the parties that although they agreed to a broad arbitration provision yet negated any implied no-strike obligation, the agreement to arbitrate and the duty not to strike should be "construed as having coterminous application." [37] The Court finally determined that "injunctive relief was appropriate . . . under the equitable principles set forth in *Boys Markets* . . . ." [38]

---

33. Of significant interest, too, is the title sheet of the National Bituminous Coal Wage Agreement of 1971, officially directed to be attached as a foresheet of the contract, on the reverse side of which appears:
"NOTE:
"The National Bituminous Coal Wage Agreement of 1971 contains those provisions in effect September 30, 1971 of the
"Appalachian Joint Wage Agreement (1941)
"Supplemental Six Day Work Week Agreement (1943)
"National Bituminous Coal Wage Agreement (1945)
"National Bituminous Coal Wage Agreement of 1968
"Not included in the 1971 National Agreement, but noted here as a matter of historical interest, is the following provision which had been in the National Bituminous Coal Wage Agreement of 1968:
"'Any and all provisions in either the Appalachian Joint Wage Agreement of June 19, 1941, or the National Bituminous

Coal Wage Agreement of April 11, 1945, containing any "no strike" or "penalty" clause or clauses or any clause denominated "Illegal Suspension of Work" are hereby rescinded, cancelled, abrogated and made null and void.'
"This printing of the 1971 National Agreement has been arranged for through the cooperative efforts of the Bituminous Coal Operators' Association, Inc. and the United Mine Workers of America." Plaintiff's Exhibit A (attached to the complaint) at ii.

34. 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

35. 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

36. 94 S.Ct. at 638.

37. 94 S.Ct. at 641.

38. *Id.* See Local 174, Teamsters Union v. Lucas Flour Company, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1964).

The test thus imposed by *Boys Markets* and approved in *Gateway* has been fully satisfied by the District Court in the case at bar. It specifically found that there was a work stoppage at Mine No. 33 due to the objection of Bethlehem to Mr. Shadden as arbitrator, which dispute was subject to arbitration under Article XVII of the 1971 Agreement; that there was likelihood of irreparable harm to Bethlehem and that although the 1971 Agreement contains no express no-strike clause, it does provide for mandatory arbitration under Article XVII of the 1971 Agreement in terms sufficient to imply a no-strike obligation under the law as set forth herein. We can find no fault in the District Court's order of June 21, 1972 in which it, among other things, "permanently enjoined [the appellants] from engaging in a strike or work stoppage at [Bethlehem's] Mine 33 and/or its adjacent Preparation Plant in Cambria County, Pennsylvania, to enforce their demand that Umpire Maurice Shadden be appointed umpire under Step 5 of the Grievance Procedure of Article XVII . . . ."

### III

To implement its determination of this case, the District Court in its order of June 21, 1972, provided:

"(5) The said umpire shall be a person selected by mutual agreement of the parties within ten days of the date of this Order; or in the event of their failure to do so the court, upon application of either party, will designate the manner of selection by the parties;".

The parties being unable to agree on the selection of an umpire under the District Court's order of June 21, 1972, it ordered on July 17, 1972 that the arbitrator be selected in accordance with the procedure noted heretofore.[39]

■■ The District Court, in fashioning the procedure for choosing the um-

pire, where, as here, the parties had failed to agree, acted well within its province. Indeed, it is expected that the District Court in a situation such as this will exercise its judicial inventiveness to devise a method for carrying out the policy designed to preserve labor peace and to foster systems of voluntary arbitration. *Textile Workers Union v. Lincoln Mills*;[40] *Boys Markets, Inc. v. Retail Clerks Union Local 770, supra*; *Textile Workers Union v. American Thread Co.*[41]

Hence the orders of the United States District Court for the Western District of Pennsylvania of June 21, 1972 and July 17, 1972 will be affirmed.

---

39. See note 7.

40. 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

41. 113 F.Supp. 137, 142 (D.C.Mass.1953).