**UNITED ASSOCIATION OF JOURNEY-MEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCAL UNION NO. 342, Plaintiff–Appellee,**

v.

**BECHTEL CONSTRUCTION COMPANY, Defendant,**

and

**Local 378 International Association of Bridge, Structural and Ornamental Iron Workers, Defendant–Appellant.**

No. 95–16974.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1997.

Decided Nov. 3, 1997.

Victor J. Van Bourg (argued), Theodore Franklin (on the briefs), Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, CA, for defendant-appellant Local 378.

Morton H. Orenstein (argued), Allen M. Kato (on the briefs), Schachter, Kristoff, Ross, Sprague & Curiale, San Francisco, CA, for defendant-appellant Bechtel.

John L. Anderson (argued), Carolyn A. Anderson (on the briefs), Neyhart, Anderson, Reilly & Freitas, San Francisco, CA, for plaintiff-appellee.

Before: HUG, Chief Judge, THOMPSON and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge.

The main issue in this case is whether, when two unions signed an arbitration agreement for jurisdictional disputes but did not fill in the name of the arbitrator, the court could hold them to the agreement and fill in the name.

## FACTS

Two unions, a Pipefitters local and an Ironworkers local, signed project agreements, involving numerous other unions as well, to build oil refineries. The project agreements provided that the unions would not strike or stop work because of jurisdictional disputes among them, and would resolve any such disputes by the participating locals if possible. If the locals could not resolve a dispute, then it would be referred to their internationals. If the international unions were unable to resolve the dispute within 15 days, then either local could refer the dispute "to _____, who will act as arbitrator."

### ARTICLE 6

#### Work Assignments and Jurisdictional Disputes

6.1 All Contractors and Subcontractors shall stipulate to and have the responsibility for making work assignments in accordance with the rules . . . .

6.2 There will be no strikes, work stoppages, or slow downs or other interferences with the work because of jurisdictional disputes.

6.3 Where a jurisdictional dispute exists and cannot be resolved by the Local Unions involved, it shall be referred for resolution to the International Unions. The resolution of the dispute shall be reduced to writing, signed by the authorized representative of the International Unions and the Contractor. The assignments made by

the Contractor shall be followed until such time as the dispute is resolved in accordance with this Article.

6.3.1  In the event that the respective International Unions of the disputing Locals and the Contractor are unable to resolve the dispute within fifteen (15) days from the date of referral, the dispute may be referred by any of the interested parties to _____, who will act as Arbitrator under this Article to hear and decide issues arising from the work assignment which is the basis for this dispute.

6.4  There shall be no work stoppage, work interruption, strike, sympathy strikes, picketing, hand billing, or public notices of any kind while any jurisdictional dispute is being resolved. Pending resolution of the dispute, the work shall continue uninterrupted as assigned by the Contractor(s)....

Authorized representatives of the many unions working on the project, including the Ironworkers[1] and Pipefitters[2], signed the two contracts.

A jurisdictional dispute arose between the Pipefitters and the Ironworkers about "first drop" work. That means each union claimed the right to have its members do unloading, handling, and rigging of pipe equipment such as tanks, pumps, and compressors. At the Chevron refinery, Bechtel, the general contractor, had the Pipefitters unload about three loads, but then made a formal assignment of the work to the Ironworkers. The Pipefitters thought that since the work had started with them, it should stay with them, so they started the process of obtaining a formal decision on this jurisdictional dispute with the Ironworkers.

The unions disagreed vigorously on how the dispute ought to be resolved. Materials in the record indicate that customarily construction industry locals unable to agree refer jurisdictional disputes to their internationals, and the work proceeds as assigned by the employer unless and until the internationals agree on something different. The Ironworkers wanted to follow this customary procedure. The institution used by the unions to resolve these disputes is an office in Washington, D.C. called the "Plan For Settlement of Jurisdictional Disputes in the Construction Industry." The "Plan" is a body created by the international unions that resolves jurisdictional disputes between locals.

The barrier to simple adherence to custom was that the unions had signed a contract to submit such disputes to arbitration, not to the Plan. The contract quoted above was signed by the Ironworkers and the Pipefitters and they are bound by it, unless the blank left for the name of the arbitrator implies lack of a meeting of the minds so that no contract was formed. The contract is an express agreement to a method for resolving jurisdictional disputes that differs from the customary approach.

When the Pipefitters and Ironworkers submitted their dispute to their respective internationals, the internationals did not make any written decision. The custom of the industry would therefore leave the employer's decision in effect, assigning first drop work to the Ironworkers. But the project agreement does not adopt the customary procedure. It says that if the internationals are unable to provide a written decision within fifteen days, "the dispute may be referred by any of the interested parties to _____, who will act as Arbitrator." The Pipefitters were not content to leave first drop work where Bechtel had assigned it, to the Ironworkers, so they demanded arbitration under this clause. The Ironworkers refused, arguing that the internationals should be left to work out a resolution through the Plan office. In the face of the Ironworkers' refusal to designate an arbitrator or proceed with arbitration, the Pipefitters designated their own preferred arbitrator, Walter L. Kintz.

Arbitrator Kintz ruled that the Pipefitters had the work first, and the earlier assign-

1.  United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local Union No. 342.

   This local is called "Steamfitters Local No. 342" in some of the documents.

2.  International Association of Bridge, Structural and Ornamental Ironworkers Local Union No. 378.

ment should be followed, so he awarded the work to the Pipefitters. The Ironworkers objected on the ground that they had never agreed to the designation of Mr. Kintz as arbitrator. When a form had been passed across the table to agree on Mr. Kintz, the Ironworker's business representative had said "there ain't going to be no arbitration," and got up and left the meeting.

The Ironworkers petitioned the district court to vacate the arbitration award. They won. The district court vacated Arbitrator Kintz's decision on the ground that the Ironworkers had not consented to his designation as the arbitrator. The Pipefitters appealed, but the case settled during the pendency of the appeal, so the appeal was dismissed pursuant to the parties' stipulation. This left the parties without an arbitration decision, since the district court order vacating Arbitrator Kintz's decision was final.

Meanwhile the Plan office in Washington, D.C., wrote to the locals that "arbitration would be deemed an impediment to job progress," that the earlier drops by the Pipefitters did not constitute a formal assignment of the work by Bechtel, and that the original assignment should be treated as having been to the Ironworkers. Thus at this point, the Pipefitters had won an arbitration but the award had been vacated, Bechtel had awarded the work to the Ironworkers, and the internationals had told both locals, in accord with industry custom, that the work should stay where Bechtel had formally assigned it, with the Ironworkers.

The Pipefitters then sued to compel arbitration. They won, even though they are now the appellant. The district court concluded that the project agreement provided for arbitration, so the customary plan resolution was not controlling. It ordered arbitration, and gave the parties about three weeks to agree on an arbitrator. If they could not, then they had an additional week to submit three names each, from which the court would appoint an arbitrator. The Ironworkers, in accord with their position that arbitration was the wrong way to proceed, refused to submit any names. The district court then appointed Mr. Gerald McKay, from the Pipefitters' list of three suggested names, as arbitrator.

Now the facts get confusing. So far the Pipefitters had won the latest case. The Ironworkers were being forced into arbitration against their will, before an arbitrator to whose appointment they did not agree, and who had been on the Pipefitters' list of suggested names. Yet instead of proceeding with the arbitration they had sought, the Pipefitters, at the last minute, backed out. Their position was that there was nothing to arbitrate, because the work had been completed. The Pipefitters had claimed to third parties that Arbitrator Kintz's award was controlling, even though it had been vacated.

Though they had not wanted the arbitration, the Ironworkers took the position that the Pipefitters could not simply back out. The arbitrator agreed with the Ironworkers on this procedural point. Arbitrator McKay noted that the Pipefitters had "a full seven months in which to decide whether it would be more appropriate to withdraw the grievance," and did not do so until three days before the hearing, without any excuse for the lengthy delay and last minute motion. He also found that not all the work in dispute had been completed, and what the Pipefitters were trying to do was hold onto the Kintz decision as though it had not been vacated. The Ironworkers and Bechtel showed up at the scheduled arbitration and presented their cases, but the Pipefitters did not show up.

Because this conduct unreasonably burdened the affected parties, Arbitrator McKay conditioned the Pipefitters' withdrawal of their grievance upon payment of the arbitrator's charges and court reporter's charges, and if the court saw fit, attorney's fees:

> What counsel for the United Association [of Pipefitters] has done is put both the Ironworkers and Bechtel to the expense of preparing to go forward with the July 26 arbitration hearing and then, at the last minute after the costs had been incurred, attempt to get out of the process by withdrawing the grievance and then claiming that it has already won. It is not appropriate under the general legal concept of estoppel by laches to put other parties to great expense and then, at the last minute, attempt to avoid litigation while still preserving the underlying position which cre-

ated the controversy in the first place. The arbitrator will not permit the United Association to withdraw its grievance unless it is willing to pick up all of the costs associated with the arbitration which it initiated through its petition to the United States District Court. Those costs will be the ones generated by the arbitrator and by the court reporting service which recorded the hearing on July 26. Counsel for the Ironworkers expressed his intention to go back to court and seek attorney's fees as well. Whether attorneys' fees are appropriate is a matter which this arbitrator will request the court to address since, traditionally, attorneys' fees are not awarded under the terms of a collective bargaining agreement.

Arbitrator McKay noted that the Pipefitters were still claiming that Arbitrator Kintz's award was appropriate; he reminded them that it was a nullity because of the district court judgment vacating it. Arbitrator McKay wrote that for the Pipefitters to announce as they did that they intended to use Arbitrator Kintz's decision "in other situations to persuade contractors to make assignments of work to it is both wrong as a matter of law and wrong as a matter of ethics." Arbitrator McKay reached the same conclusion as the Plan office, that the work assignment by Bechtel to the Ironworkers should stand.

Despite their victory regarding the underlying dispute about who should get the first drop work, the Ironworkers appealed the order that had appointed Arbitrator McKay. The Pipefitters moved to dismiss the appeal as moot, because the work that had been the subject of the jurisdictional dispute was completed. The Ironworkers moved for sanctions under 28 U.S.C. § 1927, to include attorneys' fees in both district court cases and both appeals, and preparation and presentation in both arbitrations.

## ANALYSIS

### A. Mootness.

■ The dispute about which union should get first drop work began as trivial, and ended as irrelevant, but the case is not moot. The six Ironworkers who had the job joined the Pipefitters Union after Arbitrator Kintz decided the Pipefitters should get the work.

The same men continued to perform the job, and the union dues portion of their wages just went to the Pipefitters Union instead of the Ironworkers Union during that time. As the Ironworkers' lawyer put it, "the fact is that six guys are doing the work and they have put one book in their pocket and one book in their shoe, and they continue to work on the job." The Ironworkers did not sue to recover the small sum of money involved in the dues for the period.

Though there is no longer a live controversy about which union should get the work, there is a live dispute about attorneys' fees in district court and this court and about whether the Pipefitters must pay Arbitrator McKay's expenses and the court reporter charges. We cannot decide whether the Pipefitters should be sanctioned in this court without deciding whether they or the Ironworkers were right about enforceability of the arbitration agreement. We therefore deny the motion to dismiss the appeal as moot.

### B. Arbitrability.

■ The Pipefitters argue that the Ironworkers should not be allowed to dispute arbitrability on appeal, because their notice of appeal did not designate the relevant order. The Ironworkers' notice of appeal refers only to the order designating Arbitrator McKay, not the earlier order compelling arbitration and saying that the court would designate an arbitrator if the parties did not agree on one. We reject this limitation for two reasons. First, the earlier order was interlocutory, and the order designated in the notice of appeal was the one which the district court designated as the final disposition. Second, the appeal of the order appointing Mr. McKay as arbitrator necessarily embraced the question of whether the district court could compel arbitration at all, and that issue is clearly set forth in the Ironworkers' brief. "An appeal from a final judgment draws in question all earlier, non-final orders and rulings which produced the judgment." *Litchfield v. Spielberg,* 736 F.2d 1352, 1355 (9th Cir.1984); *see also Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1422–23 (9th Cir.1989).

■ The Ironworkers, though they won the arbitration, argue that they should not have been required to arbitrate at all. This relates to their motion for sanctions as well as their appeal of the order compelling them to arbitrate. We affirm the district court's determination, because the Ironworkers entered into a contract to arbitrate. Whether the parties were required to arbitrate was a matter to be determined by the court on the basis of their contract. *John Wiley and Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 912–13, 11 L.Ed.2d 898 (1964).

The Ironworkers argue that there was an unsatisfied condition precedent to arbitrability, decision by the internationals either to resolve the dispute or to refuse to resolve it. That is an incorrect reading of the contract. The condition precedent in Section 6.3 is that the dispute "shall be *referred* for resolution to the International Unions," not that it should be *resolved* by the internationals. Then, under the condition precedent in Section 6.3.1, either local may refer the dispute to arbitration if the internationals "are unable to resolve the dispute within fifteen (15) days from the date of referral." The condition precedent was not that the internationals had to decide on jurisdiction before arbitration could be demanded, but only that they be given fifteen days before the dispute was referred to an arbitrator.

■ The Ironworkers next argue that they were not bound by a contractual agreement to arbitrate, because the contract left blank the identity of the arbitrator. They take the position that identity of the arbitrator is so great an uncertainty that the agreement to arbitrate must be treated as a mere agreement to agree, void as a contract because uncertainty as to a material term prevented mutual assent.

We have no controlling circuit authority on whether the court can fill in the blank, where the parties have agreed to arbitrate but have not agreed on who was to be the arbitrator. The Third Circuit has held that where the parties agreed on arbitration, but not on the arbitrator, the court properly ordered them to comply with a procedure it devised for appointing the arbitrator. *See Bethlehem Mines Corp. v. United Mine Workers*, 494 F.2d 726 (3d Cir.1974). The court said that the district court should ordinarily "exercise its judicial inventiveness to devise a method for carrying out the policy designed to preserve labor peace and to foster systems of voluntary arbitration." *Id.* at 740. The Fifth Circuit reached the same conclusion in *Deaton Truck Line, Inc. v. Local Union 612*, 314 F.2d 418, 421 (5th Cir.1962). The contract in that case said "the arbitrator to be agreed upon by the parties"; when they did not agree, the district court pressured the parties to reach agreement by stating that the court would appoint an arbitrator if they did not. The Fifth Circuit said that "it is important for labor peace that the processes of arbitration not be permitted to fail," and cited with approval Judge Wyzanski's view that the defect in failure to name the arbitrator should be "cured by . . . adopting as a guiding analogy the practice under Section 5 of the Federal Arbitration Act, 9 U.S.C. § 5." *Id.* at 423 (citing *Textile Workers Union v. American Thread Co.*, 113 F.Supp. 137 (D.Mass.1953)).

■ We agree with the Third Circuit and the Fifth Circuit. Preservation of labor peace requires that district courts have some flexibility in fashioning decrees to enforce agreements to arbitrate labor disputes. The parties all agreed to arbitration, and each party's agreement to arbitration was consideration for the other party's agreements to the various terms of the project agreement. The unions' mutual agreements would in the ordinary course affect the contractor's determination that labor peace was sufficiently secure so that it could proceed. Had the Ironworkers not meant to agree to arbitration, then their business representative should have struck through Sections 6.3 and 6.3.1 of the project agreement and initialed his strike-outs, so that the other parties could determine with their eyes open whether it was practical to proceed with the job. The time to say "there ain't going to be no arbitration" and walk out was before signing a written agreement to arbitrate.

The blank left for the name of the arbitrator did not turn the agreement into a unenforceable agreement to agree. Parties intending to form a binding contract could have numerous reasons for leaving the identity of the arbitrator open, despite a meeting of the

**1324**

minds on whether to arbitrate. The project agreement covered numerous issues, and arbitration of jurisdictional disputes was a small part. They might wish to leave designation of the arbitrator for a time when a dispute arose, so that they could pick someone whose experience and personality were appropriate to the particular dispute. They might wish to avoid the time and expense of going through a selection process unless and until one was needed. They might wish to avoid the risk of locating appropriate arbitrators and hashing out a selection, only to have the designated arbitrator away on vacation the week they needed him. There are many reasons why parties might intend to have a binding and final agreement, yet leave designation of the arbitrator for the occasion when the need for arbitration arose. That the term was left open does not in this instance show that the parties intended not yet to be bound.

The Ironworkers also argue that the dispute was so trivial that judicial appointment of an arbitrator was inappropriate. While it is unfortunate that so much time and money was consumed in this dispute over which union would get six workers' dues, no one argued to the district court that the dispute was de minimis. Though the financial stakes for the two unions were small, the consequences to workers and the contractor had there been a work stoppage could have been great. As the case stood when suit was filed, the dispute might have threatened labor peace.

**C. Sanctions.**

We deny the Ironworkers' motion for sanctions, insofar as it relates to proceedings in this court. As to the first appeal, it was dismissed on stipulation, and the order provided that "[t]he parties shall bear their attorneys' fees on appeal." As to this appeal, we have concluded that the Pipefitters were correct on the merits—the contract provided for arbitration and the district court properly filled in the blank for the name of the arbitrator—so the Pipefitters cannot be held to have abused the appellate process. The Pipefitters are entitled to the ordinary costs (not attorneys' fees) awarded by the clerk as a matter of course to the prevailing party in an appeal.

We intimate no view of whether sanctions should be awarded in district court. There the position of the parties differs. Although the Ironworkers' position was that arbitration was wrong, they cooperated and submitted to it. Though the Pipefitters correctly took the position that arbitration was right, they pulled out at the last minute, after dancing the Ironworkers through two lawsuits, leaving the arbitrator and the Ironworkers all dressed up with no place to go. The arbitrator awarded expenses, and left it to the district court to determine whether attorneys' fees should be awarded. We remand so that the district court may take such action as may be appropriate with respect to the arbitrator and court reporter expenses and attorneys' fees.

**AFFIRMED AND REMANDED.**

