In the
# United States Court of Appeals
### For the Seventh Circuit

No. 13-1262

JOYCE GREEN,

*Plaintiff-Appellee*,

*v.*

U.S. CASH ADVANCE ILLINOIS, LLC, and
TITLE LOAN COMPANY, both doing business as
The Loan Machine,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12 C 8079—**Joan B. Gottschall**, *Judge*.

ARGUED JUNE 5, 2013—DECIDED JULY 30, 2013

Before EASTERBROOK, *Chief Judge*, and BAUER and
HAMILTON, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Joyce Green contends that
U.S. Cash Advance, from which she borrowed money,
misstated the loan's annual percentage rate and so
violated the Truth in Lending Act, 15 U.S.C. §1606. The
lender asked the district judge to stay the litigation
and direct arbitration under ¶17 of the loan agreement:

ARBITRATION: All disputes, claims or controversies between the parties of this Agreement, including all disputes, claims or controversies arising from or relating to this Agreement, no matter by whom or against whom, including the validity of this Agreement and the obligations and scope of the arbitration clause, shall be resolved by binding arbitration by one arbitrator by and under the Code of Procedure of the National Arbitration Forum. This arbitration agreement is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U.S.C. Section 1. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right or opportunity to litigate disputes through a court, but that they prefer to resolve their disputes through arbitration, except as provided herein. THE PARTIES WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT BUT HAVE AGREED TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION, EXCEPT THAT THE TITLE LENDER MAY CHOOSE AT TITLE LENDER'S SOLE OPTION TO SEEK COLLECTION OF PAYMENT(S) DUE IN COURT RATHER THAN THROUGH ARBITRATION. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL EITHER PURSUANT TO ARBITRA-

TION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY TITLE LENDER. The parties agree and understand that all other laws and actions, including, but not limited to, all contract, tort and property disputes will be subject to binding arbitration in accord with this Agreement.

The agreement was signed on May 8, 2012. But the National Arbitration Forum has not been accepting new consumer cases for arbitration since July 2009, when it settled a suit by Minnesota's Attorney General, who believed that the Forum was biased in merchants' favor. The lender asked the district court to appoint a substitute arbitrator under 9 U.S.C. §5. The judge declined, stating that the identity of the Forum as the arbitrator is "an integral part of the agreement", that ¶17 is void, and that the dispute will be resolved on the merits in court. 2013 U.S. Dist. LEXIS 11346 (N.D. Ill. Jan. 25, 2013). The lender has taken an interlocutory appeal, as 9 U.S.C. §16(a)(1)(B) permits.

The district judge's belief that ¶17 requires the arbitration to be conducted by the Forum departs from its language, which says that any dispute "shall be resolved by binding arbitration by one arbitrator *by and under the Code of Procedure of* the National Arbitration Forum." (Emphasis added.) The agreement calls for use of the Forum's Code of Procedure, not for the Forum itself to conduct the proceedings. If ¶17 were designed to require arbitration to be conducted by the Forum exclusively, the reference to its Code would be surplusage;

the only reason to refer to the Code is to create the possibility of arbitration outside the Forum's auspices, but using its rules of procedure.

Green observes that Rule 1.A of the Code includes this language: "This Code shall be administered only by the National Arbitration Forum or by any entity or individual providing administrative services by agreement with the National Arbitration Forum." Rule 48.C qualifies this, however: "In the event a court of competent jurisdiction shall find any portion of this Code … to be in violation of the law or otherwise unenforceable, that portion shall not be effective and the remainder of the Code shall remain effective." Rule 48.D continues: "If Parties are denied the opportunity to arbitrate a dispute, controversy or Claim before the Forum, the Parties may seek legal and other remedies in accord with applicable law." One would suppose that 9 U.S.C. §5 is such an "applicable law."

Rule 1.A is "unenforceable" in light of the Forum's decision to cease conducting arbitrations. What's more, no author can control how or by whom a written work is used. Copyright law allows owners to decide how to use the texts; a declaration at the beginning of a detective novel that the reader must follow the text consecutively would not prevent the reader from skipping to the end to learn whodunit. The list of exclusive rights, 17 U.S.C. §106, does not include a right to control how the owner of a copy uses the information it contains. Cf. *Baker v. Selden*, 101 U.S. 99 (1879) (despite the author's prohibition, the buyer of a book may make and sell

forms that implement the book's ideas); *American Dental Association v. Delta Dental Plans Association*, 126 F.3d 977 (7th Cir. 1997). Patent law allows a proprietor to control how a patented article is used; with the exception of the rights in §106, copyright law does not. The Forum does not require buyers to sign contracts promising to use the Code in whole, or not at all. Compare *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996). So the exclusivity claim in Rule 1.A is not enforceable, and an agreement to conduct arbitration under the Forum's Code, with the Forum itself on the sidelines, is valid. Rules 48.C and 48.D say as much. All that remains is the selection of an arbitrator, and a district court can use §5 to make the appointment.

Suppose this is wrong and that an arbitrator is forbidden to use the Forum's Code of Procedure but must employ different rules. Would that affect the desirability of arbitration, from either a lender's perspective or a customer's? If, as the district judge thought, the designation of the Forum (or at least of its Code) is "integral" to the agreement, this implies a belief that the customer, the lender, or both would rather litigate than arbitrate under any other rules or in any other forum. Does that belief have any support? When the Forum stopped accepting arbitrations, did *any* merchant revise its contracts to eliminate the arbitration clause? Has any customer insisted on the Forum as a condition of agreeing to arbitration? The district court did not identify anyone, ever, for whom the answer has been "the National Arbitration Forum or no arbitration at all."

Two courts of appeals have held that the identity of the Forum as arbitrator is not "integral" to arbitration agreements and that §5 may be used to appoint a substitute. *Kahn v. Dell, Inc.*, 669 F.3d 350 (3d Cir. 2012); *Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1236 n.13 (11th Cir. 2012); *Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000). The Supreme Court must have assumed this in *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012), which held that claims under the Credit Repair Organizations Act are arbitrable. The agreement in that case specified use of the Forum, see *id*. at 677 n.2 (Ginsburg, J., dissenting), yet the Court saw no obstacle to enforcing the arbitration clause. We grant that *Ranzy v. Tijerina*, 393 Fed. App'x 174 (5th Cir. 2010), deems designation of the Forum "important" to arbitration and makes an agreement unenforceable once the Forum becomes unavailable, but *Ranzy* is not precedential. The decisions of the third and eleventh circuits, and the assumption of the Supreme Court, deserve greater weight.

*Ranzy* relied on *In re Salomon Inc. Shareholders' Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995). The agreement in that case named the New York Stock Exchange as the exclusive forum for private dispute resolution. The Exchange's rules gave it discretion whether to hear a dispute or send the parties to court. The Exchange's Secretary thought that litigation would be preferable (the dispute arose from allegations that traders had rigged the trading price of Treasury securities), and the Exchange's Board agreed. After the Exchange returned the case to court, the district judge declined to appoint

a substitute arbitrator under §5. The second circuit af-
firmed, observing among other things that the parties
had bargained not only for the Stock Exchange as the
sole private forum but also for a procedure under
which the Exchange could decide that litigation
would be preferable. To use §5 to appoint a substitute
arbitrator would be to defeat both aspects of the con-
tractual choice and override the chosen arbitrator's deci-
sion. Paragraph 17 of the agreement between Green
and U.S. Cash Advance differs in both respects that the
second circuit thought important. It does not name
the Forum as an "exclusive" private adjudicator, and it
does not refer the dispute to a body that had, and used,
discretion to send it back to court.

*Salomon* implemented the parties' agreement that the
chosen arbitrator may rule in favor of litigation. Green
wants us to *defeat* her agreement with the lender—for
that agreement conclusively chooses private dispute
resolution. We are skeptical of decisions that allow a
court to declare a particular aspect of an arbitration
clause "integral" and on that account scuttle arbitra-
tion itself. Section 5 reads:

> If in the agreement provision be made for a
> method of naming or appointing an arbitrator or
> arbitrators or an umpire, such method shall be
> followed; but if no method be provided therein, or
> if a method be provided and any party thereto
> shall fail to avail himself of such method, or if
> for any other reason there shall be a lapse in the
> naming of an arbitrator or arbitrators or umpire,
> or in filling a vacancy, then upon the application

of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

This tells us that arbitration clauses remain enforceable if for "any" reason there is "a lapse in the naming of an arbitrator". When a court declares that one or another part of an arbitration clause is "integral" and that the clause is therefore unenforceable as a matter of federal common law, it is effectively disagreeing with Congress, which provided that a judge can appoint an arbitrator when for "any" reason something has gone wrong. *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), tells courts not to add to, or depart from, the standards in the Federal Arbitration Act. An "integral part" proviso to §5 sounds like the sort of addendum that *Hall Street* forbids.

Section 2 of the Arbitration Act could provide a better foundation for an "integral part" escape hatch. Section 2 says that arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." This includes all general principles of state law, though not any arbitration-specific doctrines. See, e.g., *Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201 (2012); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011). So if an error—

such as the parties' mutual, but mistaken, belief that the National Arbitration Forum was available—would permit revocation of the contract under ordinary state-law principles, the district court could declare the contract as a whole unenforceable. But neither side has asked for that relief or even contended that it would be possible under state law. The identity of the arbitrator is not so important that the whole contract is vitiated. Nor does either side contend that a mutual mistake of fact allows ¶17 to be excised as a matter of general contract law.

The origin of the "integral part" approach appears to be *dictum* in *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 742 F. Supp. 1359 (N.D. Ill. 1990). We cannot find an earlier use of the word "integral" in connection with §5 of the Federal Arbitration Act. In the course of granting an employer's motion to arbitrate a dispute, the district judge observed in passing that the choice of a particular forum was *not* "integral" to the parties' bargain. The opinion did not say why an affirmative answer would matter or give any legal reason for asking the question, though it did cite *National Iranian Oil Co. v. Ashland Oil Co.*, 817 F.2d 326, 328 (5th Cir. 1987), which had asked whether a particular forum was an "essential part of the [parties'] bargain." The fifth circuit did not discuss §5 (*National Iranian Oil* concerned forum selection, not the availability of the parties' chosen arbitrator) or specify the provenance of the "essential part" inquiry, though by citing the *Restatement of Contracts* and its doctrine of severability it implied a source in common law. In the fashion of a

rumor chain, later decisions picked up on and elaborated the language of these two decisions. Today opinions such as *Kahn* and *Ranzy* proceed as if it were an established rule of law that §5 cannot be used to appoint a substitute arbitrator when the contractual designation was an "integral part" of the bargain, and they proceed to disagree about whether a given designation *is* "integral."

As far as we can tell, no court has ever explained what part of the text or background of the Federal Arbitration Act requires, or even authorizes, such an approach. In recent years the Supreme Court has insisted that the Act not be added to in a way that overrides contracts to resolve disputes by arbitration. *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), is the most recent in this line of decisions. The Court observed in *American Express* (*id*. at 2311–12) that adding requirements to the Act can prevent arbitration from being a fast and economical process. That's true of an "integral part" inquiry. How could a district judge tell what is "integral" without a trial at which parties testify about what was important to them and lawyers present data about questions such as whether consumers or businesses shifted from arbitration to litigation when the Forum stopped accepting new consumer disputes for resolution? The process would be lengthy, expensive, and inconclusive to boot.

Instead of asking whether one or another feature is "integral," a court could approach this from a different direction and assume that a reference to an unavailable

means of arbitration is equivalent to leaving the issue open. What if an arbitration clause were shorn of details? What if it did not specify how many arbitrators, what forum, or any other administrative matters? Suppose ¶17 read, in full: "Any disputes arising out of this contract will be arbitrated." Could a court then use §5 to supply particulars? If it could, then it would be hard to see any problem using §5 in the dispute between Green and U.S. Cash Advance.

The answer is yes. Section 5 applies "if no method be provided" in the contract—that is, if the parties use the sort of detail-free clause we have just imagined. We held in *Schulze and Burch Biscuit Co v. Tree Top, Inc.*, 831 F.2d 709, 715–16 (7th Cir. 1987), that a clause providing that "all disputes under this transaction shall be arbitrated in the usual manner" could be implemented through judicial orders under §5 even though the parties had not established any "usual manner." Other circuits likewise have used §5 to complete detail-free arbitration clauses. See, e.g., *Bethlehem Mines Corp. v. United Mine Workers*, 494 F.2d 726, 730 (3d Cir. 1974); *Deaton Truck Line, Inc. v. Local Union 612*, 314 F.2d 418, 421 (5th Cir. 1962); *Plumbing and Pipefitting Association v. Bechtel Construction Co.*, 128 F.3d 1318, 1320–24 (9th Cir. 1997); *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1310–13 (11th Cir. 2005).

Paragraph 17 makes one thing clear: These parties selected private dispute resolution. Courts should not use uncertainty in just how that would be accomplished to defeat the evident choice. Section 5 allows judges to

supply details in order to make arbitration work. The district judge must appoint an arbitrator, who will resolve this dispute using the procedures in the National Arbitration Forum's Code of Procedure.

VACATED AND REMANDED

HAMILTON, *Circuit Judge*, dissenting. Despite the surface simplicity of its logic, the majority has actually made an extraordinary effort to rescue the payday lender-defendant from its own folly, or perhaps its own fraud. Because the district court correctly denied the motion to compel arbitration, I respectfully dissent.

Arbitration is at bottom a matter of contract. *E.g.*, *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309 (2013); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. ___, ___, 130 S. Ct. 2772, 2776 (2010). The Supreme Court has instructed that "the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995). Yet the majority has deconstructed and rebuilt the parties' contract and now imposes on plaintiff Green a requirement to arbitrate that bears little resemblance in substance to the underlying contract the parties actually signed. Along the

way, the majority even instructs district judges to fill in all the missing terms when a contract says merely: "Any disputes arising out of this contract will be arbitrated." Slip op. at 11. That is akin to enforcing a contract to sell "some quantity" of "some goods" at "some price."

The majority's reasoning departs from the contractual foundation of arbitration. It puts courts in the business of crafting new arbitration agreements for parties who failed to come to terms regarding the most basic elements of an enforceable arbitration agreement. Section 5 of the Federal Arbitration Act need not and should not be read to authorize such a wholesale re-write of the parties' contract. It certainly should not be read to rescue an arbitration clause on behalf of the clause's author when the author knew or should have known that its designated arbitrator was unavailable. We should instead follow the reasoning and holding of the Second Circuit in *In re Salomon Inc. Shareholders' Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995), and leave the parties to the court system when their arbitration agreement fails as utterly as this one does.

To explain these conclusions, Part I reviews the unusual facts underlying this appeal, which appear to be unprecedented in federal appellate cases on section 5. Part II turns to the majority's principal theory and explains how that theory strays so far from the terms of the parties' arbitration agreement and from the existing appellate case law. Part III explains the principal flaws in the majority's broad dictum for salvaging impossibly vague arbitration agreements.

I. *The Unprecedented Facts*

The chronology of this case provides a strong basis for plaintiff Green's allegations that the parties' arbitration clause was itself a form of consumer deception and oppression. In 2009, the Minnesota Attorney General sued the National Arbitration Forum for consumer fraud by, among other things, systematically using arbitrators who were biased in favor of businesses in disputes with their consumers. See *In re National Arbitration Forum Trade Practices Litig.*, 704 F. Supp. 2d 832, 835–36 (D. Minn. 2010) (denying motion to dismiss in multidistrict litigation alleging consumer fraud and racketeering by National Arbitration Forum, and describing settlement of Minnesota state case). The Forum retreated less than a week later by settling the suit and announcing that it would no longer accept new consumer cases for arbitration.[1]

Nearly three years later, on May 8, 2012, Green signed her payday loan with defendant U.S. Cash Advance, providing for arbitration "by and under the Code of

---

[1] The district court opinion in the MDL case provides a good deal of helpful background information on the Forum, including the results of Congressional hearings, described as "rather shocking" by Judge Magnuson. 704 F. Supp. 2d at 835. Before the 2009 settlement, the Forum had built a substantial reputation as a pro-business arbitration forum. See Robert Berner and Brian Grow, *Banks v. Consumers (Guess Who Wins)*, Businessweek, June 4, 2008, www.businessweek.com/stories/ 2008-06-04/banks-vs-dot-consumers-guess-who-wins (last visited July 25, 2013).

Procedure of the National Arbitration Forum." When U.S. Cash Advance was still providing for arbitration by the Forum in 2012, was it being negligent or deliberately deceptive? Under the majority's decision, that question will not be answered in this lawsuit. Perhaps it might be answered in the arbitration the majority orders, if Green and her lawyers can afford to go forward at all.

The payday loan agreement that Green signed was certainly a contract of adhesion. Green had no bargaining power over its terms, including the arbitration clause. The idea that she actually agreed, in a subjective sense, to any arbitration clause at all therefore requires some rather heroic assumptions. Under the FAA, though, we must indulge the legal fiction and assume that she read, understood, and embraced defendant's carefully drafted arbitration clause. Even with that assumption—especially with that assumption—we should affirm the district court's denial of arbitration.

## II. *The Majority's Holdings*

### A. *The Details of the Parties' Agreement to Arbitrate*

The Supreme Court has said repeatedly that we must "'rigorously enforce' arbitration agreements according to their terms." *American Express*, 133 S. Ct. at 2309, quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985), including terms that specify who will do the arbitrating and according to which rules, *American Express*, 133 S. Ct. at 2309. Putting aside the issue of

U.S. Cash Advance's folly (or worse) in providing for arbitration by the Forum, let's look at what these parties' agreement actually meant. Our task is to determine (or construct) the parties' mutual intention for what would happen to their arbitration agreement if the Forum was not available to do the arbitration— which it was not at the time of the parties' agreement.

The key phrase in the arbitration clause says that disputes "shall be resolved by binding arbitration by one arbitrator by and under the Code of Procedure of the National Arbitration Forum." I agree with the district court that the phrase is a little clumsy, but it is clear enough. Breaking the phrase down, there are four key elements. First, use binding arbitration. Second, use one arbitrator. Third, the arbitration will be done "by … the National Arbitration Forum." Fourth, the arbitration will be done "under the Code of Procedure of the National Arbitration Forum." There is no indication that anyone other than the Forum was satisfactory to the parties.

The majority strains the contractual language badly by concluding that the reference to the Forum's Code would be "surplusage" if the parties meant for arbitration before the Forum to be exclusive, and that "the only reason to refer to the Code is to create the possibility of arbitration outside the Forum's auspices, but using its rules of procedure." Slip op. at 3–4. The supposed intent is just speculation, and the majority's reading is highly improbable. The natural reading of the rather simple phrase "by and under the Code of Procedure of

the National Arbitration Forum" is that the arbitration will be conducted both by the Forum and according to its rules. The reference to the Forum's Code of Procedure is there to communicate clearly and remove room for argument, not to allow for the possibility that the Forum might not be available. (Any competent drafter acting in good faith who even considered the possibility the majority embraces surely would have figured out that the Forum was *already* not available.)

Apart from the majority's effort to avoid the natural effect of the parties' contractual language, the exclusivity of the Forum is also found in the requirement of arbitration "under the Code of Procedure of the National Arbitration Forum," which effectively incorporated the Code into the parties' agreement. The Code shows in two places the parties' intent to have only the Forum handle any arbitration.

First, Rule 1(A) states, "This Code shall be administered only by the National Arbitration Forum or by any entity or individual providing administrative services by agreement with the National Arbitration Forum." We are supposed to enforce the contract according to its terms. The terms of the parties' contract require application of the Forum Code. The Forum Code requires that it be administered only by the Forum. The majority's decision here nullifies that requirement and effectively nullifies the parties' choice.

To avoid this simple logic, the majority uses a feint towards copyright law, which has nothing at all to do with this dispute, to declare Rule 1(A) "unenforceable."

Slip op. at 4–5. If any branch of intellectual property law is relevant to Rule 1(A), it is trademark law. The Forum's Rule 1(A), providing that only the Forum and its affiliates can use its Code of Procedure, is designed to protect the Forum's brand and reputation. The majority is correct that the Forum cannot prevent others from reading or even using its Code of Procedure, with or without adaptations. Copyright law would not help it. But Rule 1(A) was not an empty gesture. The Forum could rely on trademark law to try, at least, to prevent competitors from holding themselves out as substitutes for the Forum itself.

That reading also fits better with the reputation the Forum had built for itself by the time it withdrew from consumer arbitration. The value of its brand lay not in the details of the Code of Procedure but in the strongly pro-business reputation it had built with the many businesses it persuaded to write their form contracts to provide for arbitration of consumer disputes with the Forum. Substitutes would have diluted what was then the valuable reputation of the Forum's brand of consumer dispute resolution.

Second, the Forum's Code also says that if the Forum will not conduct the arbitration itself for some reason, the parties are left to their "legal and other remedies." Rule 48(D) provides:

> The Director or Arbitrator may decline the use of arbitration for any dispute, controversy, Claim, Response or Request that is not a proper or legal subject matter for arbitration or where the agreement of the Parties has substantially

> modified a material portion of the Code. If Parties are denied the opportunity to arbitrate a dispute, controversy or Claim before the Forum, the Parties may seek legal and other remedies in accord with applicable law.

In other words, the terms of the Forum's Code, chosen by these parties, repeat that the Code provides for arbitration by the Forum or by nobody. Since the Forum made itself unavailable, that should mean arbitration by nobody. The district court properly denied the motion to compel arbitration.

To avoid Rules 1(A) and 48(D), the majority turns to Rule 48(C), which provides a general severability clause: "In the event a court of competent jurisdiction shall find any portion of this Code … to be in violation of the law or otherwise unenforceable, that portion shall not be effective and the remainder of the Code shall remain effective." The majority first explicitly severs the provision in Rule 1(A) that Forum arbitration is arbitration by the Forum, and then severs Rule 48(D), which would send disappointed seekers of arbitration back to the courts. This methodology puts the court in the uncomfortable position of picking and choosing terms that promote arbitration and erasing the ones that do not.

There is in fact no reason to use the severability clause to nullify the important terms providing that Forum arbitration can be provided only under the Forum's own auspices, with its cohort of trusted arbitrators, or not at all. Given the choice between enforcing Rules 1(A) and 48(D) and not enforcing them, the issue is not the

legality of the provisions under copyright law, as the majority seems to think, but the parties' intentions. Rules 1(A) and 48(D) are both perfectly enforceable *between these parties*. If courts are in the business of respecting the parties' agreements, we should enforce them by affirming the parties' choice of rules, which here required arbitration by the Forum and only the Forum.

### B.  *FAA Section 5 and Relevant Case Law*

The majority builds upon the foundation of section 5 of the FAA to order the district court to appoint an arbitrator to whom the parties never agreed, and to do so without any instructions on how to make an appropriate selection. This part of the majority's opinion not only chooses the wrong side in a circuit split, but also uses reasoning that no other circuit has adopted to go farther to rescue a more deeply flawed arbitration agreement than any other circuit has.

Section 5 provides, with added numbering of the key conditional phrases:

> [1] If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but [2] if no method be provided therein, or [3] if a method be provided and any party thereto shall fail to avail himself of such method, or [4] if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then

> upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C.A. § 5. To parse the possibilities, the first conditional phrase does not apply here because the agreement provided a method for naming an arbitrator, but it cannot be followed because of the Forum's withdrawal from consumer arbitration. The second phrase does not apply because a selection method was provided. The third phrase—"if a method be provided and any party thereto shall fail to avail himself of such method"—also does not apply. A method was provided, but no party failed to avail itself or herself of the method. The fourth phrase is the residual possibility: "if for any other reason there shall be a lapse in the naming of an arbitrator . . . ."

I agree with the majority that we must assume that the parties' arbitration agreement was drafted against the background of the FAA, which we should also deem incorporated into the agreement. Whether section 5 authorizes the majority's approach depends on what counts as a lapse. That issue has divided a few circuits, but no circuit has gone as far as the majority goes here, finding a correctable lapse where a drafter has at least negligently named an arbitration forum that was *never* available.

The majority and the cases it relies upon disagree with the Second Circuit's decision in *In re Salomon Inc. Shareholders' Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995), a shareholder derivative action on behalf of the corporation against several senior executives. Each executive had signed an agreement to arbitrate any employment dispute under the rules of the New York Stock Exchange. The district court ordered arbitration before the NYSE, but the NYSE eventually decided to exercise its discretion to decline to hear the arbitration. The executives then asked the district court to use section 5 to designate a new arbitrator.

The district court denied the request, and the Second Circuit affirmed. In logic that fits this case to a T, the Second Circuit explained:

> [U]nder the arbitration agreements, all disputes were to be arbitrated by the NYSE and only the NYSE, "in accordance with the [NYSE] Constitution and rules." The NYSE Constitution clearly permits the NYSE to refuse the use of its facilities for the arbitration of any particular dispute. NYSE Const. Art. XI, § 3. When the NYSE so refuses, there is no further promise to arbitrate in another forum.

*Salomon*, 68 F.3d at 557. The Second Circuit rejected the use of section 5 to fix a supposed "lapse in the naming of the arbitrator." The court read the term as meaning a lapse in time in naming an arbitrator or filling a vacancy on a panel of arbitrators, or some other mechanical breakdown in selecting an arbitrator, and

not as a means "to circumvent the parties' designation of an exclusive arbitral forum." *Id.* at 560–61.

The majority tries to distinguish this case from *Salomon* on two grounds. Neither stands up to scrutiny. First, the majority says that the agreements in *Salomon* provided for arbitration exclusively before the NYSE and that the parties' choice here was not exclusive. In fact, the arbitration agreements in both cases did not use the word "exclusive" to designate the chosen forum, but that was the meaning of both. That was how the Second Circuit interpreted the agreements in *Salomon*. See 68 F.3d at 558 (texts of agreements). That is also the effect of both the contractual language and the Forum's Rule 1(A), as discussed above. Second, the majority says that in *Salomon*, the parties agreed that their chosen forum could decline to hear the arbitration and decide that litigation was preferable. See 68 F.3d at 557–58. But the same is true here. The Forum's Rule 48(D) says that the Forum "may decline the use of arbitration for any dispute … that is not a proper or legal subject matter for arbitration," in which case the parties are left to their "legal and other remedies." Moreover, the Second Circuit squarely rejected the solution adopted by the majority here: arbitration according to the chosen rules but before an arbitrator other than the one chosen by the parties. *Id*. at 558. *Salomon* is sound, cannot be distinguished, and calls for affirmance.[2]

---

[2] In *Ranzy v Tijerina*, 393 Fed. Appx. 174 (5th Cir. 2010), the Fifth Circuit applied *Salomon* to a case much like this one,

(continued...)

On the other side, the majority's best case is the majority opinion in *Khan v. Dell, Inc.*, 669 F.3d 350 (3d Cir. 2012), which also involved a consumer contract designating the National Arbitration Forum as the arbitrator. *Khan* is not persuasive on its own terms, and it is easily distinguishable in any event. *Khan* was wrong because it found ambiguity as to whether the key contract phrase designated the Forum as the exclusive arbitrator. The contract said that disputes "SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM (NAF) under its Code of Procedure then in effect . . . ." The majority's theory was that "EXCLUSIVELY" could be read to modify only "BINDING ARBITRATION" rather than also applying to "ADMINISTERED BY THE NATIONAL ARBITRATION FORUM," and that the ambiguity should be construed in favor of arbitration. The dissent showed persuasively that the

---

[2] (...continued)
a payday loan dispute where the contract provided for arbitration before the Forum. The *Ranzy* panel read contractual language designating the Forum as being exclusive, so it affirmed the district court's decision not to apply section 5 to pick a new arbitrator for the parties. The *Ranzy* decision was not designated as precedential, but it is persuasive, as is the district court's opinion in the case, *Ranzy v. Extra Cash of Texas, Inc.*, 2010 WL 936471 (S.D. Tex. March 11, 2010). If anything, the non-precedential designation of *Ranzy* should be read as a sign of how straightforward this problem really should be, without resorting to the extraordinary measures our majority uses to save U.S. Cash Advance from itself.

majority's strained reading was not plausible. *Khan*, 669 F.3d at 358 (Sloviter, J., dissenting). The dissent also pointed out that, given the Forum's unique history and pro-business bias, it was not at all clear that a truly neutral arbitrator would ever have been an acceptable alternative for the business that drafted the contract.

But even if *Khan* were correct on its own terms, it should not extend to the facts of this case. In *Khan*, the parties entered into their contract for Forum arbitration back in 2004, when the Forum was actually available. See 669 F.3d at 351. The majority here breaks new ground by extending section 5 to rescue an arbitration agreement signed *after* the Forum had already withdrawn from consumer arbitration. While the *Khan* panel was willing to go a long way to save Dell's ability to force arbitration, it did not give any signs that it would have been willing to extend its reasoning to the folly or worse that we see here from U.S. Cash Advance. The arbitration agreement here was a nullity from the very beginning. And by naming the Forum as the arbitrator, U.S. Cash Advance built into the parties' supposedly contractual method for dispute resolution all of the extra costs and delays it has imposed on Green in this very litigation.

The other cases the majority cites for support add little to *Khan*. In *Reddam v. KPMG, LLP*, 457 F.3d 1054 (9th Cir. 2010), overruled on other grounds by *Atlantic National Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931, 940 (9th Cir. 2010), the parties provided for arbitration under NASD rules but did not actually designate the

NASD as the arbitrator. When the *Reddam* case was presented to the NASD, it declined to arbitrate because no party to the dispute was actually a member of the NASD. There was no indication in the Ninth Circuit's opinion that the parties had ever intended the NASD to be the exclusive forum for arbitration, so the court ordered the use of FAA section 5. Our case is readily distinguishable because of the exclusive designation in the Forum rules, as well as the timing issue that makes this case unique among the circuit cases.

The Eleventh Circuit's decision in *Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217 (11th Cir. 2000), also involved a designation of a perhaps different "National Arbitration Forum" to arbitrate employment disputes. The designated "National Arbitration Forum" in that case had apparently dissolved and thus was not available. There was no indication of exclusivity in the designation, and of course there was also no issue of timing that we have here.

Thus we should follow *Salomon* and affirm. The majority errs by choosing instead the less persuasive side of a circuit split and then taking the logic of that weaker side even farther than any circuit court has gone to date, rescuing an arbitration agreement that was fatally flawed from the very beginning.[3]

---

[3] The majority makes perhaps its longest stretch in claiming its decision is consistent with an implicit assumption in the Supreme Court's decision in *CompuCredit Corp. v. Greenwood*,

(continued...)

III. *The Majority's Broad Dictum*

The majority concludes with a broad and mistaken dictum. The introduction to the dictum is the majority's criticism of the non-statutory "integral" test for deciding when to exercise section 5 power, which was used in the very cases the majority relies upon, such as *Khan* and *Reddam*. I agree, by the way, with the majority's criticism of that non-statutory test. The sounder method is simply to examine the relevant texts to determine whether the contractual selection of an arbitrator was exclusive or not. Here it was. See Forum Rule 1(A). But the majority then offers its new solution by supposing that a contract said merely: "Any disputes arising out of this contract will be arbitrated." Would that be enough to invoke section 5 to have a district court fill in all the additional details? The majority says yes, but has no direct case support for that answer.

---

[3] (...continued)
132 S. Ct. 665 (2012). The Court ordered arbitration of the parties' dispute. The opinion said nothing about the fact that the parties' contract provided for arbitration by the Forum, which had withdrawn from consumer arbitration by the time of the decision ordering arbitration. See slip op. at 6. The potential application of FAA section 5 was not any part of the question presented to the Court in *CompuCredit*. The only mention of the issue came in note 3 to respondents' brief, which advised that the lower courts had not had to decide any section 5 issue. The Supreme Court's silence concerning an issue not presented to it is a very thin reed for the majority here.

The limited language of section 5 and the contract-based logic of the Supreme Court's interpretation of the FAA point toward no.

Before looking at the case law, consider the many terms that are material in even a basic arbitration agreement. How many arbitrators will there be? Who will they be? How will they be chosen? What qualifications will they have? How will they be paid, how much, and who will pay them? What procedures will be used? How much discovery will each party be able to inflict on the other? Can the arbitrator try to subpoena witnesses? Will collective actions or class arbitration be allowed? Will any rules of evidence be used? The list could go on. I recognize that parties can and do save time in negotiating contracts by choosing the package deals offered by well-established arbitration services. But if arbitration is supposed to be a matter of contract, how on earth is a court supposed to answer these material questions as a matter of contract law if the parties say merely "arbitrate?"

The best support for the majority's dictum is *Schulze and Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 715-16 (7th Cir. 1987), in which we enforced a clause providing only that "all disputes under this transaction shall be arbitrated in the usual manner." Noting that the contract was a sale of goods between merchants, 831 F.2d at 716, we affirmed an order directing arbitration before the American Arbitration Association and according to its rules. At the time, the AAA and its procedures were the most common and familiar for

arbitration in commercial disputes between merchants. But there was no indication that we would have been willing to extend that logic to fill in all the arbitration blanks in consumer contracts, where there is no reason to expect consumers to be familiar with arbitration or any customary terms or procedures.

The other cases cited by the majority on this point involved stand-offs in the selection procedures for an arbitrator, which are the target of section 5, see *Bethlehem Mines Corp. v. United Mine Workers of America*, 494 F.2d 726, 730 (3d Cir. 1974); *Deaton Truck Line Inc. v. Local Union 612*, 314 F.2d 418, 421, 423 (5th Cir. 1962), and/or labor arbitration between unions and management where there was a course of dealing to guide the courts in filling in the details, see *Plumbing and Pipefitting Ass'n v. Bechtel Construction Co.*, 128 F.3d 1318, 1320–24 (9th Cir. 1997). These cases are not instructive for consumer arbitrations.

We should not read section 5 of the FAA to allow or require courts to decide all of the basic questions about arbitration. The designation of an arbitration forum "has wide-ranging substantive implications that may affect, inter alia, the arbitrator-selection process, the law, procedures, and rules that govern the arbitration, the enforcement of the arbitral award, and the cost of the arbitration." *Grant v. Magnolia Manor-Greenwood, Inc.*, 678 S.E.2d 435, 439 (S.C. 2009) (affirming denial of section 5 motion where designated forum had withdrawn from arbitrating the parties' type of dispute), quoting *Singleton v. Grade A Market, Inc.*, 607 F. Supp. 2d 333, 340 (D. Conn. 2009). The majority decision here

treats the parties as if they were indifferent to who would arbitrate their disputes, so long as the arbitrator uses the Forum's Code of Procedure. (That view is not realistic, though I agree with the majority's decision not to endorse the pro-business bias that probably motivated U.S. Cash Advance's preference for the Forum.) We should read section 5 as the Second Circuit did in *Salomon* and should affirm the district court's order denying the defendant's motion to compel arbitration.

## IV. *Conclusion*

Since the case is going back to the district court, it is worth pointing out just how much freedom the majority's approach leaves the district judge in appointing an arbitrator. The Forum's Code of Procedure includes some elementary requirements for neutrality, see Rules 21 and 23, but as discussed in oral argument, the judge will have wide discretion. The judge could select an arbitrator, for example, who is familiar with the practices of the payday loan industry. The judge could also select an arbitrator who is open to considering the use of claimant classes in arbitrations, perhaps on the theory that a consumer who would not voluntarily waive her rights under the Truth in Lending Act probably should not be deemed to have implicitly waived her right to the only procedure that could effectively enforce those rights. See generally *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013) (upholding class-based arbitral award where arbitrator found that contract authorized use of claimant class); *Southern Comm. Svcs., Inc. v. Thomas*, ___ F.3d ___, 2013 WL 3481467 (11th Cir. July 12,

2013) (same). And the results of arbitration, of course, are subject to only the lightest judicial review. Having forced the case out of the federal courts and into arbitration, U.S. Cash Advance will have to live with its choice.